# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHERRI PEGUES,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>RAYTHEON COMPANY; EVELYN PEGUES (aka EVELYN JOHNSON); and DOES 1 THROUGH 25,<br><br>　　　　Defendants. | Case No. CV 17-5420 DSF (GJSx)<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

This action was tried before the Court on March 12 and 13, 2019. Having heard and reviewed the evidence and having considered the parties' post-trial briefs, the Court makes the findings of fact and conclusions of law set forth below.[1]

# **FINDINGS OF FACT**[2]

1. Plaintiff Sherri Pegues[3] seeks benefits under an employee welfare benefit plan (the Plan) governed by the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq*. (ERISA).

### **A. The Plan**

2. The Plan is a group life insurance plan sponsored by Defendant Raytheon Company. Trial Exhibit (Tr. Ex.) 200, Bates Pru 0002.

3. The Plan was fully funded by group life insurance contract no. G-52020-MA (the Group Contract) issued by The Prudential Insurance Company of America to Raytheon on January 1, 2016. Id. at Bates Pru 0002-0003; Trial Transcript (TT) at 403:18-23.

4. Pursuant to the Group Contract, Prudential administered and paid from its own assets all life insurance claims under the Group Contract. Tr. Ex. 200, Bates Pru 0002, 0049; TT at 405:23-406:20; 408:24-409:5.

5. Prudential was the claims administrator and payor of all life insurance benefits under the Plan. Id.; Tr. Ex. 201, Bates RAYTHEON 0590.

---

[1] Any finding of fact deemed to be a conclusion of law is incorporated into the conclusions of law. Any conclusion of law deemed to be a finding of fact is incorporated into the findings of fact.

[2] Plaintiff submitted a "red-line" of Defendant's proposed findings of fact and conclusions of law indicating numerous disputes. Where the Court declined to adopt one of the disputed facts, the Court found the fact was either unsupported or irrelevant to its determination.

[3] To avoid confusion, the Court refers to Sherri, Marvin, and Evelyn Pegues by their first names. No disrespect is intended.

1

6. Raytheon contracted with Prudential to fully fund and administer all claims for life insurance benefits under the Plan. TT at 428:5-13.

7. The Group Contract's "BENEFICIARY RULES" section states, in part: "'Beneficiary' means a person chosen, on a form approved by Prudential, to receive the insurance benefits. . . . You may change the Beneficiary at any time without the consent of the present Beneficiary. The Beneficiary change form must be filed through [Raytheon]. The change will take effect on the date the form is signed." Tr. Ex. 200, Bates Pru 0049.

8. Under the controlling terms of the Plan, a beneficiary must be designated "on a form" approved by Prudential, and a change of beneficiary must be "filed" through Raytheon on a "form [that] is signed." Id.

9. Raytheon is a global company with more than 100,000 active and former employees who participate in numerous, varied types of employee benefit plans offered by Raytheon, including the Plan. TT at 336:1-3.

10. Raytheon contracted with a benefits administration company, a unit of Xerox (now known as Conduent), which operates as "Raytheon Benefit Center" (RBC), to render certain benefits administration functions. TT at 335:16-21; 402:17-403:1; 428:21-429:5.

11. Those functions include operating and maintaining the RBC website and call center that employees are instructed to contact if they have questions about benefits. TT at 189:23-190:5; 335:22-25; 385:8-20.

12. It was Conduent's responsibility to communicate with Raytheon employees about their benefits under the Plan and to answer

1 | employees' questions about beneficiary designations and about using the
2 | RBC website.  TT at 404:13-17.

      13.    Conduent handles approximately 170,000 calls and about 600,000 transactions on the RBC website per year.  TT at 336:1-13.

      14.    Raytheon and Conduent are separate, unrelated entities.  TT at 404:18-24.

### B. Marvin's Participation in the Plan

      15.    Marvin Pegues, Sr. participated in the Plan beginning in 1978 by virtue of his employment with Raytheon. Tr. Ex. 57, Bates Pru 0093, 94.

      16.    At that time, he was unmarried, and he designated his mother, Evelyn Johnson (a.k.a. Evelyn Pegues), as his life insurance beneficiary by filing a written, hard-copy form.  Id. at Bates Pru 0094-0097.

      17.    Marvin worked for Raytheon for the next 30+ years, during which time his circumstances changed; he married Sherri in 1982 and had two children with her.  Tr. Ex. 202.

      18.    Marvin had the ability to change his life insurance beneficiary at any time for any reason.  Tr. Ex. 200, Bates Pru 0049; TT at 438:16-23.  He also had the ability to log on to the RBC website at any time to determine who was then designated as his beneficiary.  Tr. Ex. 201, Bates RAYTHEON 0478.

      19.    Raytheon provided a Benefits Handbook to its employees, including Marvin, which informed them in part:

> Having up-to-date beneficiaries for your life insurance is important, especially if you've had a life event change—such as marriage, birth, or divorce. With Desktop Benefits, you can elect and make changes to your beneficiary(ies) any time by

| | |
|---|---|
| 1 | visiting https://raytheon.benefit center.com. If your initial |
| 2 | beneficiary election was made manually—and you want to |
| 3 | know who your current beneficiaries are before making your |
| 4 | online designation— just call the Raytheon Benefit Center at |
| 5 | 800-358-1231, Monday–Friday, 8:00 a.m.– 8:00 p.m. Eastern |
| 6 | Time (ET). Once you've named your beneficiary online, you |
| 7 | can view and change your designation online at any time. |

Id.

20. There were only two ways for a Raytheon employee to change his life insurance beneficiary under the Plan: by going to the RBC website and completing the online steps necessary to change the beneficiary, or by completing, signing and submitting to the RBC a hard copy change of beneficiary form. Id.; TT at 342:13-21.

21. On July 21, 2011,[4] Marvin called the RBC and spoke with "Art," an employee of Conduent (then Xerox). Tr. Ex. 8; TT at 373:17-19.

22. During the call, Art informed Marvin that Evelyn was the beneficiary under the Plan. Tr. Ex. 8, Bates RAYTHEON 0101.

23. Marvin stated, "OK, I need that changed to my wife." Marvin told Art that he did not know Evelyn was his beneficiary, they joked about it, and Art explained that it happens often. Id. at Bates RAYTHEON 0101-02.

24. Marvin had significant difficulty navigating the RBC website during this call. See Tr. Ex. 8.

25. Art offered to send Marvin a beneficiary change form for him to complete and return, but Marvin declined that offer and chose to

---

[4] As discussed below, the Web Trends and witness testimony confirm that Marvin spoke with Art on July 21, 2011.

4

1 attempt to make the change using the RBC website instead. Id. at Bates RAYTHEON 0101.

26. At another point in the conversation while trying to change his life insurance beneficiary, Marvin asked Art if Art could send him the form electronically. Art replied: "No, they have to send it in the mail. We can't update it on the web. You either have to do it or we have to send you the form." Id. at Bates RAYTHEON 0104-05.

27. During the call, Art attempted to walk Marvin through the online steps necessary to change his life insurance beneficiary from Evelyn to Sherri. Id. at Bates RAYTHEON 0102-0110.

28. When Marvin told Art that it appeared from the screen Marvin was viewing that the change had been made, Art informed Marvin that the beneficiary change was not reflected on the screen that Art was viewing, even though (as Art told Marvin) it should appear in "real time" on Art's screen if the change had been made. Id. at Bates RAYTHEON 0110.

29. Art then instructed Marvin to print out what Marvin saw on his computer screen and to turn it in. Id.

30. Marvin never turned in the print-out of the screen reflecting his attempt to change his life beneficiary as Art instructed him to do. TT at 358:4-6; 365:24-369:8.

31. At no time, including during Marvin's call with Art, did Marvin complete a change of beneficiary under the Plan from Evelyn to Sherri. Tr. Ex. 8; Tr. Ex. 502; TT at 255:1-263:9.

32. Marvin passed away on April 15, 2016. Tr. Ex. 205.

33. At the time Marvin passed away, the life beneficiary designation on file on a form approved by Prudential named Evelyn as his beneficiary under the Plan. TT at 464:5-9.

## C. Prudential's Investigation and Payment of Evelyn's Claim Under The Plan

34. On April 29, 2016, Prudential sent Evelyn a letter instructing Evelyn on how to submit a claim for benefits under the Plan. Tr. Ex. 204.

35. Evelyn then submitted a claim. Tr. Ex. 13.

36. Prudential approved and paid Evelyn's claim in full in the amount of $593,227.94 by a check dated May 23, 2016. Tr. Exs. 15, 17.

37. Thereafter, Sherri and her counsel wrote to Prudential asserting that Sherri, not Evelyn, was Marvin's beneficiary and that Prudential had improperly paid the benefits to Evelyn. Tr. Ex. 208.

38. In an attempt to support her assertion, Sherri submitted information to Prudential and the RBC, including declarations of Marvin's co-workers at Raytheon, Charnette Humphrey and Catalina Fuentes. Id.

39. Sherri also submitted what she asserted was a print-out of a screen shot from Marvin's computer screen reflecting Marvin's online change of beneficiary to Sherri on July 21, 2011, the day Marvin spoke with Art at the RBC (Screen Shot). Tr. Ex. 57, Bates Pru 0198.

40. In response to Sherri's assertions, Prudential contacted Conduent, and Conduent (through its employee, Cara Doughty) conducted an investigation of Sherri's assertions. Id. at Bates Pru 0128-0129, 0206-0207.

41. Doughty, after an extensive search of Conduent's files and data, determined that Conduent had no record of Marvin having designated Sherri as his beneficiary, electronically or otherwise. Id. at Bates Pru 0206-0207.

42. Doughty informed Prudential of this determination and explained that the Screen Shot is the screen Marvin would have seen on the RBC website before completing the online change of beneficiary process. Id.

43. Conduent's investigation included an examination of web transactions made from Marvin's computer, which showed that while Marvin had visited the beneficiary designation pages of the RBC website, Marvin never reached the final screen on the RBC website as was required in order to complete the online change of beneficiary process through the RBC website. Id.

44. After learning the results of Conduent's investigation, Prudential notified Sherri that the life insurance proceeds had been correctly paid to Evelyn. Tr. Ex. 22.

45. Prudential declined to pay Plan benefits to Sherri. Tr. Exs. 17, 22.

### D. **Sherri Failed to Meet Her Burden of Proving that Marvin Changed His Beneficiary from Evelyn to Sherri**

46. Conduent's Director of Technical Operations, Rayomand Sarkari, testified that Conduent records all web activity by its employees on the RBC website. TT at 190:19-20; 204:23-205:18.

47. Sarkari provided a web trends log that reflected what Marvin did, and which pages he visited, on the RBC website in July 2011 and at other times. Tr. Ex. 502; TT at 203:18-206:9.

48. Sarkari explained that the beneficiary change workflow process (Workflow) on the RBC website is a 5-step process that enables a participant to enter beneficiary information, and make beneficiary changes, for both the Raytheon pension plan as well as the subject life insurance Plan. TT at 216:18-219:25.

49. Within the Workflow, there is a spot to name one's pension beneficiary and another, different spot to name one's life insurance beneficiary. TT at 218:14-219:25.

50. Sarkari reviewed the web trends log and the transcript of Marvin's call with Art at the RBC on July 21, 2011 and confirmed that, while Marvin reached the beneficiaries review page for the Plan in the Workflow (as reflected in the Screen Shot), that page was only the fourth of the five steps needed to effectuate a change through the Workflow. TT at 220:1-221:13; 223:5-14; 232:16-233:15.

51. Sarkari and the web trends log confirm that on July 21, 2011, Marvin closed his web browser while Marvin was still on the beneficiaries review page of the Workflow, without saving the information needed to effectuate a change of life beneficiary from Evelyn to Sherri, and without ever reaching the Confirmation Page of the Workflow (the fifth and final step of the Workflow). 248:16-256:2; Tr. Ex. 503-002, Bates CHRS 000117 (Web Trends).

52. The Transcript supports Sarkari's conclusion that when Marvin said "yes" in response to Art's "submit" question (Art asked him if "[the workflow] let you submit it?"), Marvin was merely referring to the fact that he had entered "100%" next to Sherri's name on the beneficiaries review page – not that he had reached the Confirmation Page of the Workflow. Tr. Ex. 8, Bates RAYTHEON 0110; TT 232:16-23.

53. Because Marvin never reached the Confirmation Page of the Workflow, Art did not see Marvin's purported beneficiary change on the RBC system. Tr. Ex. 8, Bates RAYTHEON 0110.

54. Conduent records every beneficiary change made through the RBC website, and any such change is saved in the RBC's electronic database. TT at 204:2-8.

8

55.     Conduent checked that database twice – in 2016 and in 2019 – and confirmed that no online life beneficiary change was ever completed by Marvin.  Tr. Ex. 57, Bates Pru 0206-0207 (Doughty email); Tr. Ex. 502 (web trends log).

56.     Sarkari developed and worked with the RBC website and Workflow for 19 years.  TT at 199:21-200:7.

57.     Sarkari explained that the RBC website is based on, and connects to, Conduent's core website.  That core website is connected to the custom websites of all of Conduent's clients, so if there were any design problems or glitches in the Workflow that could have prevented Marvin or other Raytheon employees from making/saving beneficiary changes, those problems would occur not just in the RBC website, but in the custom websites of all of Conduent's clients.  TT at 194:16-196:11; 234:6-235:23.

58.     Sarkari testified any design or functionality problem with the Workflow would have been brought to his attention because he was responsible for the Workflow, and he testified that no such problem has ever been reported or detected.  TT at 200:14-19; 235:24-236:10.

59.     Sherri presented no credible evidence of a problem or malfunction in the system.  As explained below, the "problems with the system" described by Sherri's witnesses were the result of user error and mistaken beliefs about navigating the Workflow.  TT at 236:18-237:1-25.

60.     Fuentes, Marvin's former co-worker, testified that she witnessed Marvin change his life insurance beneficiary to Sherri, hit the "submit" button on the screen, and print the Screen Shot.  TT at 38:17-39-10; 55:22-25.  She stated she then walked with Marvin over to the fax machine and witnessed Marvin fax the Screen Shot to RBC.  TT at 39:11-13; 56:1-5.

9

61. She testified that <u>after</u> she witnessed Marvin fax the Screen Shot, she heard Marvin on the phone with someone at RBC. TT at 56:20-57:13. During that phone call she heard Marvin say he was mad that his beneficiary "had not changed when he – we knew that he had already submitted it." Id.

62. She stated that Marvin called RBC "because evidently, it [the change] didn't take." Id. at 55:8-19.

63. Fuentes's testimony is not credible because during the phone call with Art, Marvin is surprised to learn that his beneficiary is listed as Evelyn instead of Sherri. Tr. Ex. 8, Bates RAYTHEON 0102. Marvin does not state that he ever updated or changed his beneficiary to Sherri, nor does Marvin mention that he just faxed a change of beneficiary to RBC. Marvin and Art joke about what Sherri's reaction would be if she found out his beneficiary has been Evelyn. Id.

64. In addition, Fuentes signed an affidavit in August 2016 for the purpose of supporting Sherri's assertion that Marvin changed his beneficiary to Sherri. Tr. Ex. 57, Bates Pru 0247; TT at 63:10-19. At that time Fuentes stated, without more, that she saw Marvin update his beneficiary online and submit his marriage license in 2011. Tr. Ex. 208, Bates Pru 0204.

65. But the evidence demonstrated that the marriage license was faxed to the RBC in February 2012 for the purpose of verifying that Sherri was Marvin's dependent for health insurance purposes; that fax was unrelated to life insurance. Tr. Ex. 522, Bates CHRS 32-33; TT at 443:9-444:13.

66. Fuentes did not state in her 2016 affidavit that Marvin printed the Screen Shot, or that she witnessed Marvin fax the Screen Shot to the RBC. TT at 63:20-64:1. The Screen Shot is the document

10

relevant to this claim. If Fuentes had faxed the Screen Shot, her declaration would have stated that fact.

67. Neither Fuentes nor any other witness produced a fax cover sheet to show that the Screen Shot was ever faxed to the RBC at any time before Marvin's death. Id. at 59:20-60:16.

68. Fuentes' testimony that she witnessed Marvin fax the Screen Shot to the RBC in July 2011 was directly refuted by Doughty, Conduent's Client Service Manager who oversees a team at Conduent that handles health and welfare benefits (including life insurance) for Raytheon for the past 22 years. Id. at 333:8-335-12; 366:2-10.

69. During Doughty's entire 22-year employment with Conduent, her role has been to service Raytheon on behalf of Conduent. Id. at 334:13-16.

70. Conduent keeps case notes of every fax received by the RBC that pertains to a Raytheon employee. Id. at 366:11-367:15.

71. Conduent's case notes confirm that the RBC never received a fax (in July 2011 or at any other time prior to Marvin's death) pertaining to Marvin's life insurance beneficiary. Tr. Ex. 522; TT at 368:14-369:8.

72. If Marvin had actually submitted the Screen Shot to the RBC, he would have been told that doing so was insufficient to change his beneficiary. He would have been instructed to either complete the online Workflow process or to submit a hard-copy, signed beneficiary change form. TT at 370:12-21.

73. Because those were the only two ways a life insurance beneficiary change could be effected and recognized pursuant to the terms of the Group Contract, id. at 375:13-24, even if Sherri had established that the Screen Shot had been faxed to RBC in July 2011,

that would be insufficient to prove that Marvin effectively changed his beneficiary from Evelyn to Sherri.

74. Further, Fuentes admitted that when she purportedly saw Marvin designate Sherri as his beneficiary on the RBC website in 2011, she did not know whether he was doing so with respect to the (life insurance) Plan, the pension plan, or some other Raytheon benefit plan. Id. at 67:8-14.

75. Fuentes admitted she was unaware in 2011 that the beneficiary Workflow had different sections applicable to different types of benefits and beneficiaries, and in particular that the pension beneficiary designation section was different from the life insurance beneficiary designation. Id. at 67:2-7.

76. Humphrey, Marvin's friend and former co-worker at Raytheon, testified Marvin had updated his beneficiary under the Plan during the Plan's annual open enrollment period in 2008, 2009, 2010, and 2011. TT at 90:8-15; 91:4-16, 108:23-109:1. Humphrey also testified that she helped Marvin update his life insurance beneficiary online several times from 2008 to 2011.[5] Id. at 91:4-16.

77. This testimony does not assist Sherri. First, like Fuentes, Humphrey erroneously believed that there was only one location in the Workflow where a beneficiary could be designated or changed and that, during the period of time that she purportedly witnessed Marvin updating his life insurance beneficiary to Sherri in 2011, there was only

---

[5] Humphrey's testimony is not credible because if Marvin had actually changed his beneficiary in 2008, 2009 and/or 2010, or even if he believed he had done so, when he spoke with Art in July 2011, and Art told him that Evelyn was his life insurance beneficiary, one would expect that Marvin would have informed Art that he had previously designated Sherri as his life insurance beneficiary on more than one occasion. But the Transcript reflects no such comment by Marvin, directly refuting Humphrey's testimony that Marvin had updated his life beneficiary to Sherri several times prior to 2011. Tr. Ex. 8.

12

one screen in the Workflow where a beneficiary could be named for all benefit plans offered by Raytheon. Id. at 112:1-113:2.

78. Humphrey was mistaken. Her testimony was refuted by Sarkari who testified that from at least 2009 through 2016, the Workflow was materially unchanged, and contained separate screens for designating a pension beneficiary and a life beneficiary (under the Health & Welfare pages of the Workflow – which Sarkari described as the "bread crumb" nos. 3 and 4 in the Workflow). Id. at 201:1-18; 218:1-219:25; 233:2-15.

79. Humphrey's testimony that she saw Marvin input Sherri's information as his life beneficiary is not persuasive, given that she was unaware of the separate benefit pages, and could not confirm that Marvin changed his life insurance beneficiary with respect to the Plan. Id. at 112:1-15.

80. Humphrey also testified that she was with Fuentes in July 2011 and witnessed Marvin printing the Screen Shot before Marvin's phone call with Art, that she scanned the Screen Shot into her computer, and that she came across a copy of the Screenshot before Marvin passed away. TT at 110:7-23; 117:3-118:4; 120:4-10. This is inconsistent with Fuentes's testimony that Humphrey was not even present when Marvin "hit submit." TT at 38:24-39:2.

81. Though there is no serious argument that Marvin intended Evelyn to be his life insurance beneficiary at the time of his death, neither Marvin's alleged communications to Humphrey that he wanted to change his life insurance beneficiary, nor the alleged faxing of the Screen Shot in July 2011 were sufficient to effectuate a life beneficiary change under the terms of the Plan. Tr. Ex. 200, Bates Pru 0049.

13

### E. Marvin Did Not Substantially Comply With the Steps Necessary to Change His Beneficiary

82. During every open enrollment period (held annually in the fall), Raytheon employees were reminded to make sure their beneficiary designations were correct and up-to-date. See id. at 41:2-7; 69:14-70:10; 120:24-121:17; 345:400:7-14; 437:13-438:12.

83. This reminder was also included in a newsletter posted on the RBC website and mailed to each Raytheon employee's home every year. Id. at 345:23-346:16.

84. There were five open enrollment periods between Marvin's call to the RBC in July 2011 and his death in April 2016. Despite those multiple reminders and opportunities for Marvin to confirm his purported belief that he had changed his beneficiary, he never did so. Id. at 373:13-374:4.

85. Even though Art told Marvin in July 2011 that the purported change of beneficiary did not show up in RBC's electronic database, Marvin never thereafter logged onto the RBC website or called the RBC to confirm that a change of his life insurance beneficiary had been submitted. Tr. Ex. 8, Bates RAYTHEON 0110; TT at 256:18-263:9.

86. Marvin's failure to contact the RBC to verify the beneficiary changes establishes that he did not do all he reasonably could have done to make that change.

87. Marvin had the ability to go onto the RBC website and to view or change his life insurance beneficiary at any time. Tr. Ex. 201, Bates RAYTHEON 0478; TT at 445:14-23.

88. Marvin could have requested a change of beneficiary form at any time from the RBC, but he never did so, even though Art offered to

send Marvin a hard-copy beneficiary change form during their call on July 21, 2011. Tr. Ex. 8, Bates RAYTHEON 0101.

89. Because, as explained above, Marvin (a) never submitted the screen shot to the RBC, (b) never followed up with the RBC after his July 21, 2011 call with Art to confirm that a change of beneficiary had been made, and (c) could have asked Art to send him a written change of beneficiary form, but chose not to do any of those things, Marvin did not substantially comply with the change of life beneficiary process for the Plan.

## **CONCLUSIONS OF LAW**

1. Partial summary judgment was granted in favor of Raytheon on Sherri's ERISA-governed breach of fiduciary duty claim, leaving only a claim for relief against Raytheon for the payment of benefits under the terms of the Plan pursuant to 19 U.S.C. § 1132(a)(1)(B).

2. Under 29 U.S.C. § 1132(a)(1)(B), Plan benefits are only recoverable "under the terms of the plan."

3. Here, the Group Contract is a Plan document that governs Sherri's claim for benefits.

4. The Group Contract's "BENEFICIARY RULES" state that a beneficiary must be designated "on a form" approved by Prudential, and a change of beneficiary must be "filed" through Raytheon on a "form [that is] signed." Tr. Ex. 200, Bates Pru 0049.

5. Sherri has the burden of proving Marvin changed his beneficiary from Evelyn to Sherri as required by the terms of the Plan. See Muniz v. Amec Constr. Mgmt., Inc., 623 F.3d 1290, 1294 (9th Cir. 2010).

6. Sherri failed to meet her burden of proving that Marvin designated her as his beneficiary pursuant to the terms of the Plan.

7. Sherri cannot establish liability against Raytheon for the payment of Plan benefits under the "substantial compliance" doctrine.

8. The Ninth Circuit has recognized the equitable doctrine of substantial compliance in interpleader actions. The doctrine can be used to give effect to an insured's attempt to change a beneficiary, even though it may be less than what the plan strictly requires. See BankAmerica Pension Plan v. McMath, 206 F.3d 821, 830 (9th Cir. 2000).

9. No interpleader action has been filed here and Sherri resolved her claim against Prudential, the only party that had the ability to file one.

10. The substantial compliance doctrine does not apply outside the interpleader context. Even if it did, for the reasons stated above, Sherri still would not prevail.

11. ERISA's civil enforcement scheme represents "a careful balancing of the need for prompt and fair claims settlement procedures against the public interest in encouraging the formation of employee benefit plans." Aetna Health Inc. v. Davila, 542 U.S. 200, 208 (2004) (quoting Pilot Life Ins. Co., v. Dedeaux, 481 U.S. 41, 54 (1987)).

12. Because employers are not obligated to offer employee benefits, these interests are advanced by adhering to "a predictable set of liabilities, under uniform standards of primary conduct and a uniform regime of ultimate remedial orders and awards when a violation has occurred." Rush Prudential HMO, Inc. v. Moran, 536 U.S. 355, 379 (2002), overruled in part on other grounds by Kentucky Ass'n of Health Plans v. Miller, 538 U.S. 329, 341–42 (2003).

13. Liabilities are predictable when courts focus on the written plan documents. ERISA does not confer substantive rights; rather,

ERISA protects "contractually defined benefits." Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 148 (1985).

14. ERISA plans must be administered, and benefits paid, "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1)(D); Kennedy v. Plan Adm'r for DuPont Savs. & Inv. Plan, 555 U.S. 285, 300 (2009).

15. "The plan, in short, is at the center of ERISA. Employers have large leeway to design disability and other welfare plans as they see fit. And once a plan is established, the administrator's duty is to see that the plan is maintained pursuant to that written instrument." Heimeshoff v. Hartford Life & Acc. Ins. Co., 571 U.S. 99, 108 (2013) (internal citations, quotation marks, and alterations omitted).

16. The Supreme Court has "recognized the particular importance of enforcing plan terms as written in Section 502(a)(1)(B) claims" because "the statutory language [of Section 502(a)(1)(B)] speaks of '*enforc[ing]*' the terms of the plan, not of *changing* them." Heimeshoff, 571 U.S. at 108 (emphasis in original) (internal citations and quotation marks omitted).

17. The authorities cited by Plaintiff in support of her request for the application of the substantial compliance doctrine involve an interpleader action or are otherwise factually distinct.

18. In those cases, the insurer, or claims payor, could not determine the rightful beneficiary of benefits that had not yet been paid, and asked the court to decide which of the competing claimants should receive them. Under that scenario, courts declined to follow the otherwise applicable policy procedures for changing insurance beneficiaries and instead looked at which of the competing claimants had the stronger claim to benefits. In that limited context, courts were

17

willing to acknowledge a claimant/beneficiary where the efforts to designate said beneficiary were in "substantial compliance" with the beneficiary designation requirements.

19. Here, equitable principles do not govern because the Court granted summary judgment in favor of Raytheon on Sherri's equitable claim under ERISA Section 1132(a)(3), leaving only a Section 1132(a)(1)(B) claim for benefits under the terms of the Plan.

20. This case is distinguishable from the cases where the substantial doctrine was applied because the insurer and claims payor, Prudential, determined that Evelyn was Marvin's beneficiary and paid the benefits to Evelyn.

21. The Court is unaware of any case in which a court applied the substantial compliance doctrine to find an employer liable for the payment of plan benefits after the claims fiduciary had already paid the benefits to another party. Plaintiff has cited to none.

22. Further, in interpleader cases where the substantial compliance doctrine was applied, liability was imposed on the claims fiduciary/payor, not the plan sponsor. Sherri seeks to do the opposite.

23. The subject Plan covers more than 100,000 active and former employees. The uniform, orderly administration of employee benefits for such a large number of individuals – including formal procedures for change of beneficiary requests – mandates that written Plan provisions be followed without exception. See Moran, 536 U.S. at 379. For these reasons, the Plan cannot recognize an individual employee's mere subjective intent or incomplete efforts to change his or her beneficiary in any given circumstance, no matter how sympathetic, without seriously disrupting the administration of Raytheon's benefits program as a whole.

24. Even if this were an appropriate case in which to apply the substantial compliance doctrine, the facts demonstrate that Marvin did not "substantially comply" with the beneficiary designation process.

25. The substantial compliance doctrine applies only where it was "beyond the power of the [decedent] to comply literally" with the applicable procedural requirements for naming a beneficiary and only when the decedent made "every reasonable effort" under the circumstances to make the change before his death. <u>West Coast Life Ins. Co. v. Clarke</u>, 650 Fed. Appx. 439, 440 (9th Cir. 2016) (quoting <u>Pimentel v. Conselho Supremo de Uniao Portugueza do Estado</u>, 6 Cal. 2d 182, 188 (1936); <u>Manhattan Life Ins. Co. v. Barnes</u>, 462 F.2d 629, 633 (9th Cir. 1972) (insured had not substantially complied with the formal requirements to change his beneficiary because he had not made "every reasonable effort" to change his beneficiary).

26. Judgment shall be entered in favor of Defendant Raytheon Company and against Plaintiff Sherri Pegues on Plaintiff's claim for relief against Defendant under 29 U.S.C. Section 1132(a)(1)(B).

IT IS SO ORDERED.
Date: July 16, 2019

Dale S. Fischer
United States District Judge

19